CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
DEC 07 2020
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 4:19-cr-00029 |
| | ) | |
| MAURICE V. HOWARD and | ) | By: Michael F. Urbanski |
| DEVIN JAMAR STOCKTON, | ) | Chief United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

These matters come before the court on defendant Maurice V. Howard's remaining pretrial motions. ECF Nos. 51, 99, 104, 105, 111, 139. For the reasons articulated herein, the court **TAKES UNDER ADVISEMENT** Howard's amended motion to suppress and **DIRECTS** Howard, by counsel, to submit additional briefing and evidence on Howard's "standing" to assert his Fourth Amendment claim, i.e., whether he had a legitimate expectation of privacy in the den of Morris's home at the time of the arrest, ECF No. 51; **GRANTS IN PART** and **TAKES UNDER ADVISEMENT IN PART** Howard's motion *in limine* to admit evidence of witness Lerone Vinson's criminal history pursuant to Federal Rule of Evidence 609, ECF No. 99; **GRANTS** Howard's motion *in limine* to exclude evidence of his prior criminal history, ECF No. 104; **DENIES** Howard's motion *in limine* to exclude the cellular phone videos at the heart of this case, ECF No. 105; **DENIES** Howard's motion to dismiss Counts One and Two of the indictment for unconstitutional vagueness, ECF No. 111; and **DIRECTS** the clerk to schedule a bond review hearing on Howard's motion for bond, ECF No. 139.

## I.

On August 8, 2019, the government indicted Howard and co-defendant Devin Jamar Stockton for tampering with and conspiracy to tamper with consumer products in violation of 18 U.S.C. § 1365. The government also indicted Howard for threatening to injure the property and reputation of Monogram Snacks ("Monogram") and Packers Sanitation Services, Inc. ("PSSI") with the intent to extort money and other things of value in violation of 18 U.S.C. § 875.

At the time the alleged conduct took place, Howard and Stockton both worked for PSSI, which provided cleaning services to Monogram's manufacturing plant in Martinsville, Virginia. Monogram manufactures ready-to-eat meat snacks. Around March 2019, PSSI and Monogram employees learned of a video showing an unknown male urinating on meat in the Monogram plant and reported this to their superiors. Representatives from PSSI and Monogram interviewed employees to investigate these reports. After these interviews, Howard and Stockton told their immediate supervisors, Lerone Vinson and Johnny Vigil, that they had a copy of the video. Howard showed the video to Vigil on his cellular phone. PSSI then suspended Howard and Stockton with pay.

Howard, who was serving a term of supervised release in the Western District of Virginia, subsequently left the district. The United States Probation Office ("USPO") for the Western District of Virginia applied for a warrant to arrest Howard for violating the terms of his supervised release by leaving the district. It received that warrant on March 14, 2019. On March 25, 2019, Howard was arrested by the United States Marshals Service ("USMS") at the home of Keona Morris in Greenville, South Carolina. At the time, Howard was a guest

in Morris's home, as was Lonnie Kilgore. Kilgore is a friend of Howard's and the mother Morris's children. After arresting Howard, the USMS also recovered his cellular phone and initially placed it in a location for storing inmate property, which the defendant could access upon release and to which the defendant could also grant others access. On April 2, 2019, the Federal Bureau of Investigation ("FBI") applied for and received a warrant to search Howard's phone. The phone was then moved from inmate property into a secure location for evidence.

## II.

### A.

Howard and the government tell different tales about the discovery of Howard's phone and wallet. Howard alleges that his phone and wallet were seized from the den of Morris's home by forcing Kilgore—under threat that officers would "tear up" Morris's home—to pressure Howard into disclosing the phone's location and to retrieve the phone. ECF No. 126 at 1. Howard argues that the forced, unwarned confession of the phone's location violated his Fifth Amendment right against self-incrimination and that the subsequent seizure of the phone is fruit of the poisonous tree. Id. at 3–5. He also argues that the search of Morris's home and subsequent retrieval of his phone violated his Fourth Amendment right against unreasonable searches and seizures as he was an overnight guest at the home and had a legitimate expectation of privacy within it. ECF No. 52 at 9; see also Minnesota v. Olson, 495 U.S. 91, 98–100 (1990).

The government denies that Howard's Fourth or Fifth Amendment rights were violated. It argues that Kilgore was not forced to do anything, that if Howard disclosed the

location of the phone then he did so voluntarily, and that Agent Will Cook retrieved the phone from the area where Howard was arrested as part of a lawful protective sweep and without the aid of any disclosure by Howard. ECF No. 134. The government has not contested that Howard was an overnight guest with a legitimate expectation of privacy in Morris's home at the time of the arrest. Instead, it maintains that Howard's Fourth Amendment rights were not violated because his phone was never seized. Id. at 3–5. Because the phone was initially put into an area for holding inmate property—rather than into an area of holding evidence—the phone was not taken from Howard. Id. at 3–4. It argues that the phone was only seized when the FBI lawfully took custody of the phone while it applied for the warrant that it ultimately received to search the phone's contents.[1] Id. at 5.

## B.

The court finds that Howard's Fifth Amendment rights were not violated. If the court were to credit Kilgore's testimony and believe that Kilgore retrieved the phone, it would still find that Howard's alleged statements as to the phone's location, though given without a proper Miranda warning, were voluntary and the subsequently located phone is not the fruit of any poisonous tree.

In United States v. Patane, 542 U.S. 630, 643 (2004) (emphasis added), the Supreme Court held that "[i]ntroduction of the nontestimonial fruit of a *voluntary* statement…does not

---

[1] Howard has also argued that the FBI's warrant to search the phone was overly broad and unconstitutional. The court does not find that the search warrant was overly broad, as the authorization for location data is specific to any targets, subjects, and witnesses in the relevant criminal investigations. It was not a free pass to search as broadly as Howard argues.

implicate the Self-Incrimination Clause." Courts should presume that statements given without Miranda warnings are coerced. Id. at 639. That does not mean they are also involuntary, and Fourth Circuit precedent makes clear that the bar for involuntariness is a high one. See, e.g., United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) ("The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary.").

The court does not believe that the facts of this case reach that high bar. Kilgore testified that, after he and Howard were both escorted outside, he heard Deputy Marshals asking Howard about the location of his phone. Hr'g Tr. 67–69 (Oct. 27, 2020). Kilgore says he heard Howard respond repeatedly that he didn't have a phone and didn't know anything about any phone. Id. at 69. Kilgore testified that he then heard the Deputy Marshals threatening to "tear up" Morris's home looking for Howard's phone, but Howard maintained that he did not have one. Id. at 69–70. Because Kilgore did not want the Deputy Marshals to harm Morris's home, he allegedly asked them if he could talk to Howard. Id. at 70. After receiving their permission, Kilgore says he walked over to Howard and pleaded with him to "[t]ell these people what they want" because Kilgore had been "nothing but good" to Howard and Howard shouldn't "let these people go up there and tear [Morris's] house up" if he knew where his phone was and could give the Deputy Marshals what they wanted. Id. at 70–71. Howard then disclosed the phone's location to Kilgore. Id. at 72. In short, Kilgore allegedly persuaded Howard to answer the Deputy Marshals' questions with his and Morris's friendship in mind. That type of brief, persuasive plea would not render involuntary Howard's alleged confession. Accordingly, the court find the physical fruits

obtained because of Howard's alleged confession as to the location of his phone should not be suppressed absent some other ground for doing so.

## C.

The facts presented do not allow the court to determine whether Howard's Fourth Amendment rights were violated. The court credits Cook's testimony over Kilgore's and believes that it was Cook who retrieved the phone from Morris's den. At the suppression hearing, Cook clearly and reliably explained where the phone was, how far apart it was from the wallet, what the couch looked like, and the circumstances under which he retrieved the phone, including that Kilgore was also present in the stairwell for the phone's retrieval. Id. at 105–09. But Cook only had an arrest warrant for Howard. Id. at 122–24. He did not have a search warrant for Morris's home, nor did he have the consent of the homeowner to search for the phone. The government did not attempt to put on any evidence as to Morris's consent and nothing in the record reflects that she ever gave any indication of consent. Moreover, the court thinks it clear that the phone was seized when Cook took it from its location in the home and transported it to jail with Howard, not when the FBI had the phone moved from inmate property. Howard obviously wished to leave the phone behind and Cook's retrieval of it allowed the FBI to easily find it subsequent to his arrest.

The critical question before this court is whether that seizure was unlawful since USMS did not have a search warrant for Morris's home. "[W]hen police officers seek to enter a home pursuant to an arrest warrant, the Fourth Amendment imposes specific and different requirements for entry based on whether the home is the suspect's own residence

or someone else's." United States v. Brinkley, --- F.3d ---, 2020 WL 6685070, at *4 (4th Cir. Nov. 13, 2020).

An arrest warrant grants police officers "the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). This means that the officers must have "reason to believe" that (1) the home is in fact the suspect's residence, and (2) that the suspect will be there upon entry. Id.; see also United States v. Hill, 649 F.3d 258, 262 (4th Cir. 2011). In United States v. Brinkley, 2020 WL 6685070 at *3–6, the Fourth Circuit recently held that law enforcement officers, armed with only an arrest warrant, must have probable cause to support both of those elements and, accordingly, overturned the district court's denial of a motion to suppress.

In contrast to Payton, the Supreme Court held in Steagald v. United States, 451 U.S. 204, 211–16 (1981), that an arrest warrant alone does not authorize police to enter a third party's home.. However, that case addressed the Fourth Amendment rights of third-party homeowners, such as Morris in this case. Howard's Fourth Amendment rights, as the subject of the arrest warrant, would not be implicated by such an unlawful entry without some legitimate expectation of privacy therein. See, e.g., Kern, 336 F.App'x at 297–98; United States v. Bannon, 824 F.3d 242, 251 (2d Cir. 2016) (collecting cases). Otherwise, the subject of an arrest warrant may have greater privacy rights in a third party's home than in his own. Id.

Notably, the Fourth Circuit has treated overnight guests as residents for purposes of deciding whether Payton or Steagald controls. See U.S. v. Kern, 336 F.App'x 296, 297–98

7

(4th Cir. 2009) (unpublished, per curiam). Thus, a warrantless search of the house would violate Howard's Fourth Amendment rights if he had a legitimate expectation of privacy in the den at the time of the arrest.

Regrettably, the court cannot conclude from the evidence presented at the suppression hearing that Howard had such an expectation. Before the hearing, Howard's status as an overnight guest seemed relatively clear and uncontested. But Morris testified that Howard was, in fact, <u>not</u> an overnight guest in her home the night before the arrest. <u>Id.</u> at 52. Kilgore testified that Howard had stayed at Kilgore's mother's house that night. <u>Id.</u> at 63. Though Howard returned to Morris's home, the court cannot discern from the record whether Howard had planned to stay there on April 25, 2019, and was, at the time of the arrest, an "overnight guest," <u>see</u> <u>Olson</u>, 495 U.S. at 98–100, or merely a casual visitor without any legitimate expectation of privacy in the home and without grounds to suppress the phone and its data. See <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998) ("[A]n overnight guest in a house may claim the protection of the Fourth Amendment, but one who is merely present with the consent of a householder may not."); <u>see also, e.g.</u>, <u>United States v. Davis</u>, 235 F.R.D. 292, 310–11 (W.D. Penn. 2006) (finding one defendant had a legitimate expectation of privacy in a residence as an invited overnight guest, but another did not since he had merely fallen asleep there in the early morning hours after delivering drugs); <u>United States v. Coles</u>, 264 F. Supp. 3d 667, 677–79 (M.D. Penn. 2017) (finding defendant had no legitimate expectation of privacy in friend's apartment because he did not keep overnight necessities there and, though he had fallen asleep there, never intended to stay).

Nor can the court conclude that Howard had a legitimate expectation of privacy in the den as opposed to a guest room or some other part of the home. In Rakas v. Illinois, 439 U.S. 128, 148–49 (1978), the Supreme Court held that passengers in a car were not entitled to Fourth Amendment protections in areas of the car where they, as guests, had no legitimate expectation of privacy, including the glove compartment and underneath one of the car's seats. In dicta, the Court made clear that overnight guests in homes would be similarly limited in their ability to claim Fourth Amendment protections in areas where they were not permitted or had little familiarity. Id. at 142, 146, 148–49. Accordingly, lower courts have applied Rakas in conjunction with Minnesota v. Olson, 495 U.S. 91 (1990), to deny motions to suppress evidence found in areas of homes where guests had no legitimate expectation of privacy. See, e.g., U.S. v. Rackley, 742 F.2d 1266, 1270 (11th Cir. 1984) (finding defendant's legitimate expectation of privacy, if it existed, was limited to the guest room and, therefore, was inconsequential since no evidence was seized from there); United States v. Meyer, 656 F.2d 979, 981 (5th Cir. 1981) (finding defendants did not have reasonable expectations of privacy in the bathroom cabinet of a home in which they were visitors and had only entered the living room and master bedroom). But see United States v. Haydel, 649 F.2d 1152, 1154–55 (5th Cir. 1981) (finding defendant had legitimate expectation of privacy in a box storing gambling records located underneath his parents' bed in his parents' home, as defendant had a key, stored clothes there, and occasionally stayed overnight).

Here, Morris testified that she had four bedrooms in her house, two upstairs and two downstairs along with the den. Hr'g Tr. 55. Kilgore testified that Howard had "no reason" to

9

be downstairs at the time of the arrest. Id. at 81. If Howard was an overnight guest, it is unclear from the record where he may have slept, where he kept any personal belongings, and where in the home he may have had a legitimate expectation of privacy.

### D.

If ultimately subject to the search warrant requirement, the government argues that the phone should not be suppressed under two exceptions. For expediency, the court will dispose of those arguments now, though it has not yet resolved the Fourth Amendment "standing" issue.

First, the government argues that Cook's search of the den was still lawful as a protective sweep of the area where Howard was at the time of his arrest, citing Maryland v. Buie, 494 U.S. 325 (1990). In Buie, the Supreme Court makes clear that a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found" and may "last[] no longer than is necessary to dispel the reasonable suspicion of danger and…no longer than it takes to complete the arrest and depart the premises." Id. at 335–36. Here, Cook clearly testified that he went back into the house after Howard was already handcuffed and out of the house and while the atmosphere was deescalated—so much so that he permitted Morris to resume cooking dinner. Hr'g Tr. 102–04, 122–24. Unrelated to the process of arresting Howard, Cook said he conducted a search of the area where Howard had been arrested to ensure that no guns or drugs were left behind that could pose a danger later on down the line. Hr'g Tr. 106–09, 122–24. Cook's reasoning has nothing to do with finding Howard or keeping himself or his fellow Deputy Marshals safe from Howard or

10

from another hidden person's attack. As such, Cook's retrieval of the phone from the den is outside the scope of the lawful protective sweep exception to the warrant requirement.

Second, the government argues that Howard's phone should not be suppressed because the FBI would have inevitably discovered it. To overcome the exclusionary rule, the government must prove by a preponderance of the evidence that it would inevitably have discovered the tainted evidence by lawful means. Nix v. Williams, 467 U.S. 431, 444–48 (1984). The court rejects the idea that the FBI would have inevitably secured a warrant to search Morris's home and found the phone had it been left behind by the USMS. That sort of "inevitability" presumes that law enforcement officers can and will find almost anything, does not satisfy the preponderance of the evidence standard, and would make the Fourth Amendment a rather flimsy constitutional right.

### E.

Ultimately, it is Howard's burden to prove that the cellular phone and its data should be suppressed. See States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). For these reasons, the court respectfully **DIRECTS** Howard, by counsel, to submit additional briefing and evidence addressing whether Howard had a legitimate expectation of privacy in Morris's den at the time of his arrest. Howard should submit its supplemental brief within 30 days of this order. The government will have 30 days to respond. Should Howard need an additional evidentiary hearing on the matter, he may request it.

### III.

At trial, the government intends to introduce testimony from Howard's and Stockton's director supervisor, Lerone Vinson. Howard, through a motion *in limine*, seeks to

admit evidence of Vinson's three prior criminal convictions as impeachment evidence pursuant to Federal Rule of Evidence ("FRE") 609. ECF No. 99. The government argues that evidence of two of those convictions is time-barred and, for the third, only the fact that Vinson is a convicted felon is admissible for impeachment. ECF No. 107. Howard counters that none of Vinson's convictions are subject to FRE 609(b)'s heightened evidentiary standard because he was released from prison for all three convictions on the same day and, even if subject to FRE 609(b), the details of his convictions are not unfairly prejudicial.

The court agrees that Howard should not be penalized for pandemic-related continuances of his trial and accepts the parties' agreement to use the previous May 18, 2020, trial date as the relevant date for determining admissibility under FRE 609. ECF No. 99 at 4; ECF No. 107 at 4. The rule limits the admissibility of evidence of witnesses' prior convictions "if more than 10 years have passed since the witnesses' conviction *or release from confinement for it, whichever is later*." Fed. R. Evid. 609(b) (emphasis added). Vinson's incarceration records reflect that he was released from custody for all three convictions on October 5, 2010, so all three convictions fall within 10 years of the May 18, 2020, trial date. ECF No. 114-1. Accordingly, the court **GRANTS IN PART** Howard's motion *in limine* to admit evidence of Vinson's criminal convictions to the extent the motion seeks to have such convictions evaluated under FRE 609(a) rather than FRE 609(b).

The court is inclined to limit Howard's evidence on this issue to the fact that Vinson is a convicted felon, but will give Howard the chance to lay the proper foundation for his contention that "the nature and number of convictions have given rise to Mr. Vinson's ulterior motive" for giving misstatements in this case. ECF No. 114 at 2. Accordingly, the

12

court **TAKES UNDER ADVISEMENT** Howard's motion to the extent that it seeks to admit details of Vinson's criminal convictions.

### IV.

The government also would like to introduce evidence of Howard's flight from federal supervised release, the U.S. Marshal's recovery of Howard's cell phone during an arrest for violating the terms of his supervised release, and admissions made during a call Howard made from jail after that arrest. ECF No. 109 at 3. The government plans to use this evidence to demonstrate Howard's consciousness of guilt through flight. See United States v. Henley, 811 F.App'x 159, 164 (4th Cir. 2020) (unpublished) (citing United States v. Obi, 239 F.3d 662, 665 (4th Cir. 2001). Howard seeks to exclude this evidence under FRE 404(b) and FRE 403, as unduly prejudicial and presumptively inadmissible evidence of prior bad acts, lacking sufficient evidentiary value and relevance to any element of the charged crimes. See United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997). The government argues that FRE 404(b) is inapplicable because all the evidence is intrinsic to the crime with which Howard is presently charged.

The court finds that the government is capable of presenting evidence of flight and consciousness of guilt through deletion of the cell phone video without mentioning Howard's supervised release violation. The details of his supervised release violation are extrinsic to the crime at issue here and would be unduly prejudicial to Howard. Accordingly, the court **GRANTS** Howard's motion *in limine* to exclude evidence of his prior criminal history. ECF No. 104.

### V.

At trial, the government also plans to introduce two cell phone videos at the heart of this case. The first portrays a male in PSSI equipment urinating on a doorjamb or frame. The second portrays male genitalia urinating on meat snacks. Howard seeks to exclude this evidence under FRE 403 given the "inflammatory nature" of the videos, which he argues would be unfairly prejudicial and without sufficient probative value. ECF No. 105 at 1. The government argues that these videos are highly probative and critical to showing that the alleged crime in fact occurred, outweighing whatever prejudicial effect the videos might have. ECF No. 110 at 3.

The court agrees with the government that, given their centrality to this case, the videos' probative value clearly outweighs their prejudicial effect. Accordingly, the court **DENIES** Howard's motion *in limine* to exclude the two cellular phone videos at issue. ECF No. 105.

## VI.

Howard has also moved to dismiss Counts One and Two of the indictment for unconstitutional vagueness. ECF No. 111. Howard argues that his Fifth Amendment due process rights would be violated if prosecuted under the statute given its vague and circular definition of "bodily injury" within it, which includes "any injury to the body, no matter how temporary." 18 U.S.C. 1365(h)(4). Howard alleges that the "no matter how temporary" clause fails to provide adequate standards for enforcement, much like the residual clause struck down in Johnson v. United States, 576 U.S. 591, 595 (2015). Relying on expert testimony it intends to introduce at trial, the government argues that Howard's actions clearly fall within the conduct prohibited by the statute and, therefore, a facial challenge due

to purported vagueness at the margins is inappropriate under Holder v. Humanitarian Law Project, 561 U.S. 1, 18–20 (2010). Though inclined to agree with the government about the potential harm of the alleged conduct, the court declines to dismiss Howard's constitutional challenge on evidence it has not yet seen.

Alternatively, the government also argues that Howard's vagueness challenge lacks merit because the statute's definition of "bodily injury" is clear enough to put ordinary people on notice of the statute's prohibited conduct. Indeed, the Fourth Circuit has read this very same definition into 18 U.S.C. § 242, which failed to define "bodily injury," and recognized the definition at issue here as "the established definition of 'bodily injury.'" United States v. Perkins, 470 F.3d 150, 160–61 (4th Cir. 2006). The Fourth Circuit's willingness to read this "established" definition into other statutes strongly indicates that the definition is sufficiently clear. Accordingly, the court does not find that the definition of "bodily injury" in 18 U.S.C. § 1365 is unconstitutionally vague and **DENIES** Howard's motion to dismiss Counts One and Two of the indictment on those grounds. ECF No. 111.

## VII.

Finally, and most recently, Howard seeks pretrial release to house arrest, with location monitoring, until his trial. ECF No. 139. On April 6, 2020, the court, through Judge Ballou, denied Howard's prior motion for pretrial release upon completion of his sentence for violating his terms of supervised release. ECF No. 89. The court did so because of the serious charges against Howard and his long criminal history, including nine guilty convictions for either failure to appear or contempt of court which cast doubt on Howard's ability to not obstruct justice and follow the rules—including social distancing rules—while

on release. Id. at 2. However, the court also considered Howard's risk of contracting the coronavirus while in jail to be low considering the precautions taken by prisons. Those precautions, though essential and admirable, have been unable to stop the rampant spread of the virus throughout those close environments. Moreover, at the time the court ruled on Howard's request for bond—April 6, 2020—no one appreciated how long the public safety crisis posed by the COVID-19 pandemic would last.

Due to Howard's age, the nonviolent nature of his offense, and the substantial risks posed by the COVID-19 pandemic in this district, the court **DIRECTS** the clerk to schedule a bond review hearing with Judge Ballou or this court as soon as practicable.

An appropriate order will be entered on all the court's pretrial rulings.

Entered: December 4, 2020

Michael F. Urbanski
Chief U.S. District Judge
2020.12.04 17:15:02 -05'00'

Michael F. Urbanski
Chief United States District Judge