IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 4:19-cr-00029 |
| v. | ) | |
| | ) | By: Michael F. Urbanski |
| MAURICE V. HOWARD and | ) | Chief United States District Judge |
| DEVIN JAMAR STOCKTON, | ) | |
|    Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the court on defendant Maurice V. Howard's amended motion to suppress physical and digital data from his cellular phone. Am. Mot. to Suppress, ECF No. 51. The government opposes the motion. Mem. in Opp., ECF No. 57. After a number of delays related to the COVID-19 pandemic, the court held an in-person suppression hearing on October 27, 2020. ECF No. 123. Howard, co-defendant Devin Jamar Stockton, and the government then submitted supplemental briefing to address the relevance of certain Supreme Court precedents to the motion to suppress. ECF Nos. 126, 131, 134. On December 7, 2020, the court took the motion to suppress under advisement because, though the court found that the warrantless search was unreasonable, it could not conclude that Howard had standing to suppress the evidence obtained by it because, contrary to prior briefing, evidence presented at the suppression hearing showed that Howard was not an overnight guest in Keona Morris's home the night prior to his arrest. ECF No. 143 at 6–10. The court directed the parties to submit additional briefing addressing whether Howard had a legitimate expectation of privacy in Morris's den at the time of his arrest. Id. at 11. For the reasons explained in the court's prior opinion and herein, the court will **DENY** Howard's motion to suppress.

I.

On August 8, 2019, the government indicted Howard and co-defendant Devin Jamar Stockton for tampering with and conspiracy to tamper with consumer products in violation of 18 U.S.C. § 1365. Indictment, ECF No. 3. The government also indicted Howard for threatening to injure the property and reputation of Monogram Snacks ("Monogram") and Packers Sanitation Services, Inc. ("PSSI") with the intent to extort money and other things of value in violation of 18 U.S.C. § 875. Id.

At the time the alleged conduct took place, Howard and Stockton both worked for PSSI, which provided cleaning services to Monogram's manufacturing plant in Martinsville, Virginia. Monogram manufactures ready-to-eat meat snacks. Am. Mot. to Suppress, ECF No. 51, at 1. Around March 2019, PSSI and Monogram employees learned of a video showing an unknown male urinating on meat snacks in the Monogram plant and reported this to their superiors. Id. at 2. After some investigation, Howard and Stockton told their supervisors that they had a copy of the video. Id. Howard showed the video to one supervisor on his cellular phone. Id. PSSI then suspended Howard and Stockton with pay. Id.

Howard subsequently left the district to visit friends in Greenville, South Carolina, including Keona Morris and her guest, Lonnie Kilgore. Hr'g Tr., ECF No. 133, at 24, 64, 153. Kilgore is a friend of Howard's and the father of Morris's children. Id. at 52, 62. Two nights before his arrest, Howard spent the night in Morris's home. Id. at 52, 63. Morris testified that she had four bedrooms in her house, two upstairs and two downstairs with the den. Id. at 55. Nothing in the record suggests Howard was provided a key, given a particular room to sleep and store belongings, or had seen or stayed in the home prior to that weekend. The night

before his arrest, Howard spent the night at Kilgore's mother's house. Id. at 52, 63. Howard came back the next day to socialize and share a meal with Morris and Kilgore, but he does not argue nor does he proffer any evidence that he brought clothes or an overnight bag into the home or intended to stay the night again. Nothing in the record suggests Morris excluded Howard from certain areas of the house, either as an overnight guest or as a returning social guest on the day of his arrest, though Kilgore testified that Howard had "no reason" to be downstairs at the time of the arrest. Id. at 81.

At the time of his trip, Howard was serving a term of supervised release in the Western District of Virginia. Howard's conditions of supervision dictate that he "shall not leave the judicial district without the permission of the court or probation officer" and he "shall submit to warrantless search and seizure of person and property as directed by the probation officer, to determine whether the defendant is in possession of illegally controlled substances and/or firearms." J. at 3–4, United States v. Howard, No. 4:04-cr-70067-JLK-1 (W.D. Va. June 13, 2005), ECF No. 58. On March 14, 2019, the United States Probation Office ("USPO") for the Western District of Virginia applied for and received a warrant to arrest Howard for violating the terms of his supervised release by leaving the district. Arrest Warrant, Howard, No. 4:04-cr-70067-JLK-1 (W.D. Va. Mar. 14, 2019), ECF No. 86.

On March 25, 2019, Howard was arrested by the United States Marshals Service ("USMS") in the downstairs den of Morris's home. Hr'g Tr., ECF No. 133, at 81. At the time, the Marshals were aware that Howard's phone might contain incriminating evidence, but were unaware of the details of the investigation being conducted at that time by the Federal Bureau of Investigation ("FBI"). Id. at 8–10, 22–28, 96–98, 120. The Marshals seized Howard's

3

phone, brought it with him to jail, and placed it in inmate property, which the defendant could access upon release and to which the defendant could also grant others access. Id. at 112–15. Later, the phone was moved from inmate property into a secure location for evidence pending the issuance of a search warrant. Id. at 39; FBI Report, ECF No. 57-3. On April 2, 2019, the FBI received a warrant to search the phone. Search and Seizure Warrant, ECF No. 57-2.

      Howard and the government tell different tales about the discovery of Howard's phone during his arrest. At the suppression hearing, Howard alleged that his phone and wallet were seized from the den of Morris's home by forcing Kilgore—under threat that officers would "tear up" Morris's home—to pressure Howard into disclosing the phone's location and to retrieve the phone. Suppl. Mem., ECF No. 126, at 1. Shortly after the Marshals' arrival, Kilgore and Howard were both escorted outside, and Kilgore testified that he heard the Marshals asking Howard about the location of his phone. Hr'g Tr., ECF No. 133, at 67–69. Kilgore says he heard Howard respond repeatedly that he didn't have a phone and didn't know anything about any phone. Id. at 69. Kilgore testified that he then heard the Marshals threatening to "tear up" Morris's home looking for Howard's phone, but Howard maintained that he did not have one. Id. at 69–70. Because Kilgore did not want the Marshals to harm Morris's home, he allegedly asked them if he could talk to Howard. Id. at 70. After receiving their permission, Kilgore says he walked over to Howard and pleaded with him to "[t]ell these people what they want" because Kilgore had been "nothing but good" to Howard and Howard shouldn't "let these people go up there and tear [Morris's] house up" if he knew where his phone was and could give the Deputy Marshals what they wanted. Id. at 70–71. Howard then disclosed the

4

phone's location to Kilgore. Id. at 72. Kilgore then alleges he retrieved the phone from the den. Id.

The government argued Kilgore was not forced to do anything, that if Howard disclosed the location of the phone then he did so voluntarily, and that Agent Will Cook retrieved the phone from the area where Howard was arrested as part of a lawful protective sweep and without the aid of any disclosure by Howard. Second Mem. in Opp., ECF No. 134. Cook testified that he went back into the house after Howard was already handcuffed and out of the house and while the atmosphere was deescalated—so much so that he permitted Morris to resume cooking dinner. Hr'g Tr., ECF No. 133, at 102–04, 122–24. Unrelated to the process of arresting Howard, Cook said he conducted a search of the area where Howard had been arrested to ensure that no guns or drugs were left behind that could pose a danger later. Id. at 106–09, 122–24. Cook clearly and reliably explained where the phone was, how far apart it was from the wallet, what the couch looked like, and the circumstances under which he retrieved the phone. Id. at 105–09.

The court found in its prior opinion that any statements Howard may have made to Kilgore to locate the phone were voluntary and not the basis of any Fifth Amendment violation. Ultimately, the court credits Cook's testimony over Kilgore's and believes that it was Cook who retrieved the phone from Morris's den. But Cook exceeded the scope of the arrest warrant for Howard when he went back into the home to obtain the phone, allegedly as part of a protective sweep. Id. at 122–24. Cook's reasoning for searching the den has nothing to do with finding Howard or keeping himself or his fellow Marshals safe from Howard or from another hidden person's attack. Cook did not have a search warrant for Morris's home, nor

did he have the consent of the homeowner to search for the phone. The government did not put on any evidence as to Morris's consent and nothing in the record reflects that she ever gave any indication of consent. As such, the court found in its prior opinion that Cook's retrieval of the phone from the den is outside the scope of the lawful protective sweep exception to the warrant requirement.

The court took the suppression motion under advisement because it could not conclude that Howard had a legitimate expectation of privacy in Morris's home at the time of the arrest such that he had standing[1] to challenge his phone's seizure from inside it. The parties' prior briefing assumed that Howard was an overnight guest in Morris's home and, therefore, the legitimacy of his expectation of privacy was not questioned. But Morris testified that Howard was, in fact, not an overnight guest at the time of his arrest. Hr'g Tr., ECF No. 133, at 52. The court asked the parties to provide supplemental briefing on this issue and, if needed, offered to hold a second evidentiary hearing. The parties submitted supplemental briefs but did not submit additional evidence nor request an evidentiary hearing.

## II.

"In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on

---

[1] "The requirement that the defendant have a reasonable expectation of privacy in the property—often characterized as whether the defendant has 'standing' to challenge the search—is not jurisdictional, but it is nonetheless a threshold inquiry…." U.S. v. Ferebee, 957 F.3d 406, 412 (4th Cir. 2020). "The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." Byrd v. United States, --- U.S. ---, 138 S. Ct. 1518, 1530 (2018).

a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993). "The defendant bears the burden of proving that he has a reasonable expectation of privacy. If the defendant does have such an expectation, then the court must determine the reasonableness of the search and seizure." United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992) (internal citation omitted).

### III.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, Fourth Amendment rights are personal and do not extend to every person present during a search. United States v. Bullard, 645 F.3d 237, 242 (4th Cir. 2011). The mere fact that the government seeks to introduce evidence against a defendant does not, by itself, convey standing to challenge the search that uncovered that evidence. United States v. Gray, 491 F.3d 138, 144 (4th Cir. 2007) ("It is axiomatic that 'suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'") (quoting Alderman v. United States, 394 U.S. 165, 171–72 (1969)). Instead, a defendant must show he had a "legitimate expectation of privacy" in the place searched to have standing to suppress the evidence found therein under the Fourth Amendment. United States v. Castellanos, 716 F.3d 828, 846 (4th Cir. 2013), cert. denied, 134 S. Ct. 832 (2013). "To be legitimate, an expectation of privacy must be objectively reasonable:

it must flow from 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Gray, 491 F.3d at 145 (quoting Minnesota v. Carter, 525 U.S. 83, 89 (1998)).

Society recognizes that a person "may have a legitimate expectation of privacy in the house of someone else." Carter, 525 U.S. at 89. "[A]n overnight guest has a legitimate expectation of privacy in his host's home." Minnesota v. Olson, 495 U.S. 91, 98 (1990). And "[t]he Supreme Court has long held that the relatives of home owners who regularly reside at the residence are protected by the Fourth Amendment." Gray, 491 F.3d at 144 (citing Bumper v. North Carolina, 391 U.S. 543, 546–48 (1968)). But Fourth Amendment protections do not extend to "anyone legitimately on the premises where a search occurs." Carter, 525 U.S. at 90. For example, "a temporary visitor to a residence—perhaps the mailman or a pizza deliverer—cannot generally claim the Fourth Amendment's protections." Gray, 491 F.3d at 145 (citation omitted).

The Fourth Amendment also distinguishes between individuals who are social guests and business visitors. Id. In Carter, 525 U.S. at 90, the Supreme Court held that the defendants had no Fourth Amendment protections in the apartment where incriminating evidence was obtained because they were "essentially present for a business transaction and were in the home a matter of hours." The Fourth Circuit's application of Carter and Olson in Gray focused on the distinction between business visitors and social guests. See Gray, 491 F.3d at 145–46. And the Fourth Circuit has previously held that a social guest had Fourth Amendment standing in another's home though she was not an overnight guest because she visited the home frequently to assist an elderly woman she called "Grandma." Bonner v. Anderson, 81

F.3d 472, 475 (4th Cir. 1996). Howard argues he was a social guest and has standing to challenge the search of Morris's home after his arrest. See Second Suppl. Mem., ECF No. 146.

The government does not dispute that Howard was a social guest in Morris's home, but argues that his ties to her home were not deep and continuous enough to create a legitimate expectation of privacy which society is prepared to recognize. Under the government's reading, the Fourth Circuit used the term "social guest" in Gray to distinguish such guests from "business visitors"—the focus of its opinion—but ultimately defined social guests narrowly to include "overnight guests" and "social visitors with near-familial relationships." Third Mem. in Opp., ECF No. 150, at 7 (citing Gray, 491 F.3d at 153). To fill in guidance for how to treat social guests who lack "near-familial relationships," Gray, 491 F.3d at 153, the government directs the court to the Third Circuit's unpublished opinion in United States v. Rose, 613 F. App'x 125 (3d Cir. 2015). Based on Rose, the government asks this court to find that Howard did not have Fourth Amendment standing as a dinner guest after analyzing the following nine factors: (1) the visitor's possessory interest in the premises; (2) storage of clothing or property; (3) possession of a key; (4) permission to be on the premises without the owner; (5) receipt of mail on the premises; (6) common access to occupied areas of the premises; (7) ability to exclude others; (8) relationship with the primary resident; and (9) previous visits to the premises. Id. at 129–30. The government also argues that Howard did not have a legitimate expectation of privacy in Morris's home because his out-of-state visit to her home violated the terms of his supervised release. Id. at 9.

In short, this case requires the court to determine the scope of Fourth Amendment protections for social guests who fall somewhere in between overnight guests and temporary

9

visitors. Supreme Court precedent does not answer directly whether Howard falls within or outside of those protections. In Olson, the Court made clear that "[s]taying overnight in another's home is a longstanding social custom that services functions recognized by society," ultimately finding that, "[f]rom either perspective,…society recognizes that a houseguest has a legitimate expectation of privacy in his host's home." 495 U.S. at 98. In so holding, the Court rejected the use of a test similar to the one applied by the Third Circuit in Rose as "needlessly complex," at least for overnight guests. Id. at 96. Under Olson, an overnight guest need not prove that he could exclude others, possessed a key, had any legal interest in the property, or had a certain degree of control over the premises. Id. at 98–99.

In Carter, the Court held that a person inside another's home for a short time solely for the purpose of packaging cocaine had no legitimate expectation of privacy within that home because, unlike in Olson, that person could not demonstrate a similar relationship "to suggest a degree of acceptance into the household." 525 U.S. at 90. The court reasoned as follows:

> If we regard the overnight guest in Minnesota v. Olson as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely 'legitimately on the premises' as typifying those who may not do so, the present case is somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

Id. at 91. Chief Justice Rehnquist wrote the opinion of the Court, which Justices O'Connor, Scalia, Kennedy, and Thomas joined. Id. at 84. Justice Scalia, joined by Justice Thomas, noted in a separate concurrence that the Court "went to the absolute limit of what text and tradition

10

permit in [Olson] when we protected a mere overnight guest against an unreasonable search of his hosts' apartment." Id. at 96–97. By contrast, Justice Ginsburg, joined by Justices Stevens and Souter, reasoned in her dissent that "[t]he logic of [Olson] extends to shorter term guests as well," and "[o]ne need not remain overnight to anticipate privacy in another's home…." Id. at 108–09. Justice Breyer agreed, though he concurred with the judgment on alternative grounds. Id. at 103. Justice Kennedy also agreed to some extent, noting in his concurrence that "most, if not all, social guests legitimately expect that, in accordance with social custom, the homeowner will exercise her discretion to include or exclude others for the guests' benefit." Id. at 101. Altogether, Justice Ginsburg noted that "five Members of the Court would place under the Fourth Amendment's shield, at least, 'almost all social guests.'" Id. at 109 n. 2 (citation omitted). The majority critiques Justice Ginsburg's analysis as "render[ing] the operative language in [Olson] almost entirely superfluous." Id. at 90 n. *.[2]

The Fourth Circuit's relevant case law also leaves questions unanswered. In between Olson and Carter, the Fourth Circuit found that a woman had a legitimate expectation of privacy in another home because, although she was not an overnight guest, she was a frequent visitor, her half-sister had been raised in the home, she previously lived in a neighboring building on the property, and she often assisted and ran errands for the elderly homeowner, who she called "Grandma." Bonner, 81 F.3d at 475. Accordingly, the Fourth Circuit found that "the principles that guided Olson [were] applicable." Id. In Gray, 491 F.3d 138, the Fourth

---

[2] The court finds this full picture of the Justices' dispositions illuminating as to the scope of the holding in Carter, as did the District of Columbia Court of Appeals in Morton v. United States, 734 A.2d 178, 180–82 (D.C. 1999), but at least one court has found that adding up these five Justices' views amounts to nothing more than "reading of tea leaves given the Supreme Court's clear guidance in Rakas v. Illinois," 439 U.S. 128 (1978). Rose, 613 F. App'x at 129 n. 2.

11

Circuit upheld a district court's denial of a suppression motion, agreeing that the defendant was a business visitor with no reasonable expectation of privacy under Carter.

Thus, in some instances, the Fourth Circuit's analysis focused on the purpose of the visit, distinguishing sharply between all social guests and business visitors. See, e.g., id. at 145–46. In others, its analysis focused on "the depth of the social relationship," id. at 153, noting that the defendant had no key, was not planning on staying the night, did not have any private space in the home, "as one would often expect with a social guest." Id. at 152. Acknowledging Bonner, the Gray court explained that, "[w]hile we have recognized that persons other than overnight guests can have a legitimate expectation of privacy in the home of another, we have done so in the context of social visitors with near-familial relationships." Id. at 153.

Other circuits have varied in how they frame social guests' expectations of privacy, but all seem to look to the depth of the guest's connection to some degree. For example, in United States v. Rhiger, 315 F.3d 1283, 1287 (10th Cir. 2003), the Tenth Circuit found that a "social guest" who had not stayed overnight prior to the search in question had a legitimate expectation of privacy because of "his regular presence at the home, his overnight stays, the discovery of his receipts in the house, and his comfort in entering the residence unannounced and taking a nap," all of which supported the conclusion that the defendant "had an ongoing and meaningful connection to [the] home as a social guest." In United States v. Pollard, 215 F.3d 643, 647–48 (6th Cir. 2000), the Sixth Circuit found a defendant had standing to contest a search because he had been friends with the lessee for seven years, had stayed at the home earlier that week, occasionally spent the night at the residence, kept some personal belongings in a living room closet, and was allowed to stay in the home even if the residents were not

present. In Morton v. United States, 734 A.2d 178, 179–82 (D.C. 1999), the District of Columbia's Court of Appeals found that a social guest who had known the homeowner for 10 years, visited frequently, and was "like family," but had been in the home for less than five minutes before police entered, had standing to challenge to search's legality.

By contrast, the Eleventh Circuit has held that an "invited guest" is insufficient to support a legitimate expectation of privacy if one isn't an overnight guest and "did not demonstrate any of the other indicia of control necessary to assert a Fourth Amendment claim," such as possessing a key to the home, storing possessions there, or having the right to exclude others. United States v. Bossio, 824 F. App'x 818, 822 (11th Cir. 2020) (citing United States v. Rackley, 742 F.2d 1266, 1270 (11th Cir. 1984) (guest who did not stay in house night before search and did not keep a full wardrobe there, but had stayed the night several times the month prior and had a key, may have had a legitimate expectation of privacy in the guest room whenever he stayed there but nothing more)). And, as mentioned above, the Third Circuit rejected a dinner guest's Fourth Amendment challenge, finding that the defendant had no legitimate expectation of privacy in the apartment searched because he had no possessory interest in any part of it, he did not store any clothing or property there, he had no key to the apartment, he did not have permission to be at the apartment without the owner's presence or consent, he did not receive mail there, five other guests had access to the same areas he occupied, he had no ability to exclude anyone from the apartment, he was a casual acquaintance of the apartment owner, and there was no evidence that he had ever visited the apartment previously. Rose, 613 F. App'x at 129–30.

Here, again, Howard's case falls somewhere in the middle, seemingly having a stronger social connection to the home than in Gray, Rose, or Bossio, but a weaker one than in Bonner, Rhiger, or Pollard. Howard was not a near-family relation to Kilgore or Morris. Howard and Kilgore were friends and former cellmates during their shared time in a federal prison. Hr'g Tr., ECF No. 133, at 62, 76–77. From this connection, Howard seems to have formed friendships with Kilgore, Kilgore's mother, and Morris. Howard was more than a one-time dinner or party guest. He stayed in the house at least one night and was there again for a meal at the time of the search. But Howard, bearing the burden of proof for his suppression motion, presented no additional evidence that could have strengthened his connection to the home, such as plans to stay there the night of the search, prior visits to the home, his possession of a key, his ability to exclude others from the apartment, and his storage of any possessions within the house other than his wallet and phone, which is unremarkable since most individuals carry these items on their person wherever they go.

On top of all this, Howard was violating the terms of his supervised release by visiting Morris and Kilgore outside of the Western District of Virginia without the permission of his probation officer. The Supreme Court has found that parolees and probationers are less protected by the Fourth Amendment than those who are not under some form of supervision. See, e.g., Griffin v. Wisconsin, 483 U.S. 868 (1987); United States v. Knights, 534 U.S. 112 (2001); Samson v. California, 547 U.S. 843 (2006).[3] The Fourth Circuit has also acknowledged

---

[3] However, the Supreme Court has recognized that probationers have greater expectations of privacy than parolees. See Samson, 547 U.S. at 850 ("On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."); see also United States v. Reyes, 283 F.3d 446, 458 (2d Cir. 2002) ("We have held that among the rights diminished by parolee status are Fourth Amendment protections. This observation applies with equal force to individuals, like Reyes, subject to federal supervised release-the reformed successor to federal parole. Like parole, supervised

that "individuals under supervision have diminished rights under the Fourth Amendment." United States v. Pickens, 295 F. App'x 556, 557 (4th Cir. 2008); see also United States v. Reyes, 283 F.3d 446, 457 (2d Cir. 2002). Still, "law enforcement officers generally may not search the home of an individual on supervised release who is not subject to a warrantless search condition unless they have a warrant supported by probable cause." United States v. Hill, 776 F.3d 243, 249 (4th Cir. 2015); see also United States v. Bradley, 571 F.2d 787, 789 (4th Cir. 1978). But Howard is subject to a warrantless search condition and this search was not even in Howard's home—it was in the home of a friend who lived outside of the Western District of Virginia, where Howard was not supposed to be without his probation officer's permission. The court finds this scenario similar to United States v. Curtis, in which the district court found that a person under post-release supervision did not have a sufficient privacy interest in a third person's home, where the defendant was sleeping though it was not his approved residence, to outweigh the Government's interest in public safety and reducing recidivism among supervised individuals. No. 5:17-cr-11-1H(2), 2017 U.S. Dist. LEXIS 189055, at *17–18 (E.D.N.C. Oct. 10, 2017), R. & R. adopted, No. 5:17-cr-11-1H, 2017 U.S. Dist. LEXIS 188482 (E.D.N.C. Nov. 15, 2017).

Under the totality of these circumstances, the court finds that Howard does not have standing to contest the search of Morris's home and the subsequent seizure of his phone. From the evidence presented to this court, Howard's connection to Morris's home was short,

---

release is a term of supervision following incarceration. However, it differs from parole in an important respect: unlike parole, supervised release does not replace a part of a term of incarceration, but instead is...given in addition to any term of imprisonment imposed by a court.") (emphasis in original) (internal citations and quotation marks omitted).

15

limited in scope and depth, and unauthorized under the terms of his supervised release, which is why he was arrested in the first place. The combination of these factors leads the court to conclude that Howard did not have an expectation of privacy in Morris's home which society is prepared to recognize. Accordingly, the court finds that Howard does not have standing to challenge the search of Morris's home and his motion to suppress the evidence obtained therein must be denied.[4]

### III.

Howard also argues that the Fourth Amendment protects his personal property from being seized without a warrant or some other lawful justification. ECF No. 146 at 13–14. Citing United States v. Jeffers, 342 U.S. 48 (1951), Howard argues that he had a legitimate expectation of privacy in his personal property even if he did not have a legitimate expectation of privacy in Morris's home and, therefore, can challenge the reasonableness of its seizure. ECF No. 146 at 13–14. In Jeffers, the Supreme Court found that the seizure of cocaine from a hotel room violated the Fourth Amendment and should have been suppressed. 342 U.S. at 50. The hotel room was assigned to and paid for by the defendant's aunts, who had given the defendant a key to the room and gave him permission to use it at will, and the defendant entered and used the room often. Id. In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court rejected the idea that one could suppress evidence based on ownership of the seized

---

[4] The court originally questioned whether Howard had a legitimate expectation of privacy in the den specifically. ECF No. 143 at 9–10. The court need not delve into this issue since Howard did not have a legitimate expectation of privacy in the home in its entirety. The government also asks this court to find that Howard abandoned his phone, to hold that his phone was lawfully recovered under the wingspan rule, to find that suppression is not the proper remedy under the attenuation doctrine, and to reconsider whether the government had proven by a preponderance of the evidence that Howard's phone would have been inevitably discovered by lawful means. ECF No. 151 at 7–13. The court declines to delve into these new arguments and to revisit its inevitable discovery analysis for the same reason.

items alone. In the process, the Court distinguished Jeffers, noting that "[s]tanding in Jeffers was based on Jeffers' possessory interest in both the premises searched and the property seized." Id. at 136; see also Rawlings v. Kentucky, 448 U.S. 98, 105–06 (1980). The Fourth Circuit has also made clear that "[m]ere ownership does not establish standing to challenge a search and seizure." U.S. v. Doreste, 947 F.2d 942 (4th Cir. 1991); see also United States v. Ramapuram, 632 F.2d 1149, 1154 (4th Cir. 1980). Accordingly, the court finds that Howard does not have standing to object to the seizure of his personal property because it was found in a home where he had no legitimate expectation of privacy.

## IV.

Because Howard does not have standing to challenge the search of Morris's home, his motion to suppress physical and digital data from his cellular phone found therein, ECF No. 51, will be **DENIED**.

An appropriate order will be entered.

Entered: March 29, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.03.29 17:14:07
-04'00'

Michael F. Urbanski
Chief United States District Judge